Nathan G. Steele, OSB No. 004386
THE STEELE LAW FIRM, P.C.
125 NW Greeley Avenue
Bend, OR 97703
Telephone: (541) 647-1812
Email: ngs@steelefirm.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **CYNTHIA F. TISHER**, individually, and **J. L. T.**, a minor, by and through his guardian ad litem, Cynthia F. Tisher, <br><br> Plaintiffs, <br><br> v. <br><br> **THE BOEING COMPANY**, a foreign business corporation, **SPIRIT AEROSYSTEMS, INC.**, a foreign business corporation, **QUIK TEK MACHINING, LLC**, a foreign limited liability company, and **ALASKA AIRLINES, INC.**, a foreign business corporation, <br><br> Defendants. | Case No. 3:25-cv-01984-SI <br><br> **FIRST AMENDED CIVIL COMPLAINT** <br><br> **(Product Liability, Negligence, Negligence *Per Se*, Breach of the Duty of a Common Carrier, Breach of the Implied Warranty of Merchantability)** <br><br> **(JURY TRIAL DEMANDED)** |

Plaintiffs Cynthia F. Tisher, individually, and J.L.T., a minor, by and through his guardian ad litem, Cynthia F. Tisher, (collectively, "Plaintiffs"), allege as follows:

## I.    INTRODUCTION

1. Plaintiffs bring this action for personal injuries and related damages arising from the in-flight separation of a Mid-Exit-Door ("MED") plug from a Boeing 737-9 MAX aircraft ("Incident Aircraft"), which caused an explosive cabin depressurization during Alaska Airlines Flight 1282 on January 5, 2024 (the "Incident Flight").

## II. PARTIES TO THIS COMPLAINT

2.   Plaintiff Cynthia F. Tisher ("Mother") is an adult citizen and resident of the State of Oregon. She brings this action in her individual capacity, and in a representative capacity as the Court-appointed guardian ad litem for her minor son, J.L.T.

3.   Plaintiff J.L.T. ("Son") is a minor and a citizen and resident of the State of Oregon. He brings this action through his Court-appointed guardian ad litem, Cynthia F. Tisher. Pursuant to Federal Rule of Civil Procedure 17(a)(1)(C) and District of Oregon Local Rule 17, the Court entered an Order on October 28, 2025, appointing Mother as guardian ad litem for Son in this action. All claims asserted

on behalf of J.L.T. are therefore brought through his duly appointed guardian ad litem.

4.   Defendant The Boeing Company ("Defendant Boeing") manufactures commercial aircraft in the United States, including Boeing 737 MAX series aircraft assembled at its Renton, Washington facility.

5.   Defendant Spirit AeroSystems, Inc. ("Defendant Spirit") designs and manufactures components for commercial aircraft, including MED plugs and fuselage assemblies incorporated into Boeing 737 MAX series aircraft, at its Wichita, Kansas facility.

6.   Defendant Quik Tek Machining, LLC ("Defendant Quik Tek") operates as a machining and manufacturing company that produces fuselage framing and related structures for Boeing 737 MAX series aircraft, including rivets and framing components, at its Wichita, Kansas facility.

7.   Defendant Alaska Airlines, Inc. ("Defendant Alaska") is a commercial airline and common carrier that provides air transportation services to fare-paying passengers throughout the United States, including passengers residing in and traveling to and from the State of Oregon.

8.   Each Defendant acted through its employees, agents, contractors, and managers, all of whom performed the acts and omissions alleged herein within the course and scope of their employment or agency relationships, and in furtherance

of each Defendants' business interests. Each Defendant is legally responsible for those acts and omissions under the doctrines of respondeat superior, agency, apparent authority, and all other applicable principles of vicarious liability recognized by law.

## III. SUBJECT-MATTER JURISDICTION, PERSONAL JURISDICTION, AND VENUE

### A. Subject-Matter Jurisdiction

9. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs. For purposes of diversity jurisdiction:

- a.  Plaintiffs are citizens of the State of Oregon and are currently residents of Oregon;

- b.  Defendant Boeing is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Arlington, Virginia;

- c.  Defendant Spirit is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Wichita, Kansas;

d. Defendant Quik Tek is a Kansas limited liability company whose sole members are citizens of the State of Kansas and it maintains its principal place of business in Wichita, Kansas; and

e. Defendant Alaska is a corporation incorporated under the laws of the State of Washington with its principal place of business in Seattle, Washington.

Complete diversity therefore exists between the parties, and the Court has diversity jurisdiction pursuant to 28 U.S.C. 1322(1)(1).

10. The total amount in controversy—including Plaintiffs' claimed economic, non-economic, and punitive damages—exceeds $75,000, exclusive of interest and costs, thereby satisfying the jurisdictional requirements of 28 U.S.C. § 1332(a).

**B. Personal Jurisdiction**

11.  Personal jurisdiction over each Defendant is proper for the following reasons:

a.  <u>Defendant Boeing</u>. Defendant Boeing is subject to specific personal jurisdiction in Oregon. Boeing designs, manufactures, assembles, certifies, and supports commercial aircraft, including the 737-9 MAX model at issue in this case. Defendant Boeing has maintained a continuous and deliberate commercial presence in Oregon for decades: it has been registered to do business in Oregon since 1964, maintains a registered agent for service of process in Salem, Oregon, and operates a

FIRST AMENDED CIVIL COMPLAINT -5

major manufacturing and machining facility in Gresham, Oregon—its

"Center of Excellence" for complex machining—which employs more

than 1,000 people and produces precision components used in

Defendant Boeing's commercial-aircraft product lines. Defendant

Boeing therefore conducts ongoing engineering, manufacturing, and

aviation-related operations in Oregon that materially support its

nationwide aircraft programs. Defendant Boeing also designs and

manufactures commercial aircraft for continuous nationwide operation,

including aircraft that fly into, out of, and through Oregon airspace

every day. Defendant Boeing derives substantial revenue and ongoing

commercial benefit from aircraft operating in Oregon, and from its

sustained Oregon-based business operations. The Incident Aircraft

experienced a MED plug failure while operating in Oregon airspace,

causing the explosive depressurization and resulting injuries in Oregon.

Plaintiffs' claims arise out of, or relate to, Boeing's design,

manufacture, assembly, inspection, certification, and quality-assurance

of the MED-plug system incorporated into the Incident Aircraft. Under

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S.

351 (2021), strict "but-for" causation is not required; it is sufficient that

the claims "arise out of or relate to" Defendant Boeing's forum-

connected activities. Courts in this Circuit apply the same standard, and hold that specific personal jurisdiction exists where a defendant's suit-related conduct bears a substantial connection to the forum. Defendant Boeing has purposefully availed itself of the privilege of conducting substantial, continuous aviation business in Oregon by manufacturing components in Oregon, maintaining a business registration and a registered agent in Oregon, integrating Oregon-produced parts into its aircraft programs, and supplying aircraft that predictably and routinely operate in Oregon airspace. Because Plaintiffs' claims arise out of, or relate to, Boeing's forum-directed aviation activities, the exercise of specific personal jurisdiction fully comports with due process under *Ford Motor* and controlling Ninth Circuit authority.

b.  <u>Defendant Spirit</u>. Defendant Spirit is subject to specific personal jurisdiction in Oregon. Defendant Spirit is a Delaware corporation that has conducted continuous business activity in Oregon for more than fifteen years, including maintaining an active Oregon business registration and a registered agent for service of process in Salem, Oregon. Defendant Spirit is one of the world's largest manufacturers and suppliers of commercial-aircraft fuselage assemblies and structural components, including components incorporated into Boeing 737 MAX

aircraft. Defendant Spirit supplies these aircraft components directly into Boeing's nationwide production system with the clear expectation that aircraft incorporating its components will be placed into interstate commercial service and will routinely operate throughout the United States, including in Oregon. Defendant Spirit publicly represents that its components are supplied to major aircraft Original Equipment Manufacturers ("OEMs") and first-tier aerospace companies, including Defendant Boeing, and are routinely used in commercial aircraft serving national and international markets. The MED plug assembly incorporated into the Incident Aircraft was designed, manufactured, and supplied by Defendant Spirit and was purposefully placed into the national stream of commerce with the reasonable expectation that it would be installed on commercial aircraft operating in and through Oregon. The MED plug assembly failed while the Incident Aircraft was flying through Oregon airspace, causing explosive depressurization and resulting injuries in Oregon. Plaintiffs' claims arise out of, or relate to, Defendant Spirit's design, manufacture, supply, and quality-control of the aircraft-structural components incorporated into the Incident Aircraft. Under *Ford Motor*, strict "but-for" causation is not required; it is sufficient that the claims relate to Defendant Spirit's forum-

connected activities. Defendant Spirit intentionally participates in the nationwide commercial-aviation supply chain by placing components into a distribution system that predictably results in commercial aircraft routinely operating in Oregon. Combined with Defendant Spirit's long-standing business presence in Oregon, these deliberate and continuous contacts make the exercise of jurisdiction entirely foreseeable and fully consistent with due process. Because the claims relate directly to Defendant Spirit's forum-connected activities, and specifically to the failure of a Defendant Spirit-designed and supplied component while the aircraft was operating in Oregon airspace, specific personal jurisdiction over Spirit squarely satisfies *Ford Motor* and controlling Ninth Circuit authority.

c.  <u>Defendant Quik Tek</u>. Defendant Quik Tek is subject to specific personal jurisdiction in Oregon. Quik Tek manufactures aerospace components and publicly advertises that it provides fabricated components and services to "local, regional, national and international customers," including major aircraft OEMs and first-tier aerospace companies such as Defendant Boeing. These OEMs and first-tier companies operate aircraft throughout the national commercial-aviation market, including regularly into, out of, and through Oregon airspace.

FIRST AMENDED CIVIL COMPLAINT -9

Defendant Quik Tek further represents that it operates an industry-certified aerospace quality-management system and specializes in precision components intended for integration into commercial-aircraft production programs. By marketing itself as a national and international aerospace supplier and by supplying aircraft-structural components for aircraft continuously operating in the national commercial-aviation market, including Oregon, Defendant Quik Tek deliberately avails itself of a nationwide market that necessarily includes aircraft operating in Oregon airspace. It was reasonably foreseeable, and a direct and commercially predictable consequence of Defendant Quik Tek's business model, that its components would be installed on aircraft flying in Oregon, and that defects in those components could cause injury in Oregon. On information and belief, Defendant Quik Tek manufactured fuselage-frame components incorporated into Boeing 737 MAX aircraft, including components located in the structural area adjacent to the MED plug assembly on the Incident Aircraft. On information and belief, nonconformities or defects in Defendant Quik Tek's fuselage-frame components contributed to assembly-related conditions affecting the installation, retention, and securement of the MED plug, and were part of the sequence of events culminating in the

MED plug separation while the Incident Aircraft was operating in Oregon airspace, and causing injury in Oregon. Plaintiffs' claims arise out of, or relate to, Defendant Quik Tek's design, manufacture, and supply of aircraft-structural components that were integrated into aircraft placed into interstate commercial service nationwide, including aircraft operating into, out of, and through Oregon. By manufacturing and supplying components for commercial aircraft intended for continuous interstate operation, Defendant Quik Tek purposefully availed itself of the privilege of conducting activities with foreseeable effects in every state in which those aircraft operate, including Oregon. Under *Ford Motor*, strict "but-for" causation is not required so long as the claims relate to the defendant's forum-connected activities. Because Defendant Quik Tek deliberately directed its manufacturing activities toward the nationwide commercial-aviation market, including foreseeable operations in Oregon, and because Plaintiffs' injuries occurred in Oregon while such an aircraft was in operation, the exercise of specific personal jurisdiction over Quik Tek fully comports with due process under *Ford Motor* and controlling Ninth Circuit authority.

d.    <u>Defendant Alaska</u>. Defendant Alaska is subject to specific personal jurisdiction in Oregon. Defendant Alaska is an Alaska corporation that

has been continuously registered to do business in Oregon since 1979.

Defendant Alaska maintains a registered agent for service of process in

Salem, Oregon, has filed annual reports in Oregon for more than four

decades, and conducts substantial, continuous commercial operations

within Oregon. Alaska maintains offices and employs Oregon-based

personnel who support its flight, ground, and customer-service

operations. Alaska operates daily commercial flights into, out of, and

through Oregon's airports and airspace and derives substantial revenue

from Oregon passengers. Defendant Alaska's ongoing aviation

operations and business activities in Oregon are continuous, deliberate,

and integral to its commercial enterprise. The Incident Aircraft was

being operated by Defendant Alaska in Oregon airspace at the time the

MED plug failure occurred, causing the explosive depressurization and

resulting injuries in Oregon. Plaintiffs' claims arise out of, or relate to,

Defendant Alaska's operation, maintenance, inspection, and control of

the Incident Aircraft, including its responsibility to ensure the aircraft's

airworthiness, safe configuration, and proper post-maintenance

condition before carrying passengers in Oregon's airspace. Under *Ford

Motor*, strict "but-for" causation is not required; it is sufficient that the

claims "relate to" Defendant Alaska's forum-connected aviation

activities. Defendant Alaska deliberately serves and benefits from Oregon's commercial-aviation market by routinely operating aircraft, including the Incident Aircraft, into, out of, and through Oregon as part of its regular business. Because Plaintiffs' injuries occurred in Oregon while Defendant Alaska was operating the Incident Aircraft in Oregon airspace, and because Defendant Alaska's aviation operations in Oregon are purposeful, sustained, and foreseeably connected to the risks at issue, the exercise of specific personal jurisdiction over Defendant Alaska fully comports with due process under *Ford Motor* and controlling Ninth Circuit authority.

## C. Additional Jurisdictional and Venue Facts

12.  While the Incident Aircraft was operating in Oregon airspace, the MED plug assembly failed, causing the plug to detach and resulting in an explosive decompression. Plaintiffs suffered immediate physical and psychological injuries during the incident.

13.  Plaintiffs were fare-paying passengers on the Incident Flight and sustained physical and psychological injuries in Oregon, where the decompression occurred, and where the aircraft was forced to return for emergency response.

14.  The injury-producing event and all resulting harm in this case occurred in Oregon. The MED plug failure manifested while the Incident Aircraft was

operating in Oregon airspace, causing an explosive decompression that immediately injured Plaintiffs in Oregon. The aircraft returned and landed in Oregon, where Oregon-based emergency responders, medical personnel, and federal investigators conducted the initial response, triage, and safety assessments. Because the tortious event, the injuries, and the initial investigation all occurred in Oregon, the State of Oregon has a compelling and direct sovereign interest in adjudicating this matter. These Oregon-centered events create a substantial connection between the forum and the underlying controversy, satisfying the "arise out of or relate to" standard under *Ford Motor*, as well as the Ninth Circuit's consistent interpretation that specific jurisdiction exists where a defendant's forum contacts bear a meaningful relationship to the plaintiff's claims.

15.   Without conceding that any jurisdictional defect exists, Plaintiffs plead in the alternative that, pursuant to 28 U.S.C. § 1367(d), ORS 12.220, and all applicable doctrines of equitable tolling, the statutes of limitation applicable to Plaintiffs' claims against each Defendant are tolled during the pendency of this action and for any period provided by law in the event any claim is dismissed for lack of personal jurisdiction or on any other non-merits ground. Plaintiffs expressly reserve the right to refile any such claim in any court of competent jurisdiction, and no Defendant will suffer prejudice from such tolling because each has been timely placed on notice of the claims, facts, and theories asserted herein.

FIRST AMENDED CIVIL COMPLAINT -14

16.   Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b)(1)–(2)

because Defendants transact substantial business within this District, and a

substantial part of the events giving rise to these claims—including ticketing,

travel arrangements, the in-flight failure of the MED plug, emergency response,

injuries, and post-incident medical treatment and investigation—occurred in this

District.

**IV. ALLEGATIONS COMMON TO ALL CLAIMS**

17.  Plaintiffs re-allege and incorporate by reference each of the allegations set

forth above as though fully restated herein.

18. From approximately 2015 to the present, Defendant Boeing has been subject to

multiple federal investigations and enforcement actions concerning systemic

manufacturing and quality-control deficiencies on its 737 and 737 MAX

production lines. Those investigations—conducted by the Federal Aviation

Administration ("FAA"), United States Department of Justice ("DOJ"), Securities

and Exchange Commission ("SEC"), National Transportation Safety Board

("NTSB"), and the United States Senate— identified pervasive lapses in Defendant

Boeing's safety-management and quality-management systems, and resulted in

compliance agreements, consent orders, and monetary penalties and fines

exceeding $4 billion.

19. At all relevant times, Defendant Alaska was on actual or constructive notice of the deficiencies described in paragraph 18 above, the related enforcement actions, and  publicly reported findings exposing manufacturing and safety deficiencies affecting the airworthiness of Boeing 737 MAX aircraft.

20.  In or about October 2022, Defendant Alaska entered into an agreement with Defendant Boeing to purchase fifty-two 737 MAX aircraft, including the Incident Aircraft.

21. Upon information and belief, in or about 2023, Defendant Quik Tek manufactured one or more edge frames intended for integration into the fuselage of the Incident Aircraft. During that manufacturing process, Defendant Quik Tek installed defective or improperly seated rivets in one such frame (the "Defective Frame"). Upon information and belief, Quik Tek either failed to conduct a required inspection of the Defective Frame or, despite inspection, negligently approved it as conforming to applicable specifications. The Defective Frame was thereafter shipped from Quik Tek's Wichita, Kansas facility with the defective rivets in place, rendering it unreasonably dangerous and unsuitable for incorporation into a commercial-aircraft fuselage.

22. Defendant Spirit took delivery of the Defective Frame at its Wichita, Kansas facility and incorporated it into the port-side fuselage section of the Incident Aircraft without correcting or replacing the defective rivets. Defendant

Spirit subsequently installed the MED plug immediately aft of the Defective Frame. In doing so, Defendant Spirit failed to ensure that the fuselage assembly complied with applicable design specifications, quality-control requirements, and airworthiness standards. As a result, the fuselage section delivered by Defendant Spirit to Defendant Boeing was unreasonably dangerous and defective when it left Defendant Spirit's control.

23.  Defendant Boeing took delivery of the fuselage section of the Incident Aircraft from Defendant Spirit at Defendant Boeing's Renton, Washington facility, with the Defective Frame in place. During assembly, Defendant Boeing's employees identified the defect and notified on-site Spirit employees responsible for replacing the defective rivets. To perform that repair, removal of the MED plug was required. Defendant Boeing personnel were responsible for removing and reinstalling the MED plug, including the retention bolts securing it in place. Despite the critical nature of that task, Defendant Boeing failed to provide its employees with any written procedures, training, or instructions governing the proper removal and reinstallation of an MED plug.

24.  Upon information and belief, Boeing employees removed the MED plug, and Defendant Spirit employees replaced the defective rivets. Defendant Boeing employees then reinstalled the MED plug in its original location but failed to reinstall the retention bolts required to secure it to the fuselage of the Incident

Aircraft. Defendant Boeing personnel did not create, maintain, or retain any written record of the removal or reinstallation, or, upon information and belief, destroyed or failed to preserve such documentation. The MED plug was positioned immediately adjacent to what became passenger row 26 on the Incident Aircraft.

25.  Defendant Boeing employees either conducted an inadequate inspection of the MED-plug reinstallation or failed to inspect it altogether. Despite that omission, Defendant Boeing personnel certified or otherwise approved the MED-plug reinstallation as complete, allowing production of the Incident Aircraft to proceed to final assembly. As a result, the Incident Aircraft departed Boeing's Renton, Washington facility in a defective and unreasonably dangerous condition, unfit for safe commercial operation.

26.  On or about August 19, 2023, Plaintiffs purchased two passenger tickets from Defendant Alaska for travel on the Incident Flight.

27. On or about October 31, 2023, Defendant Alaska took delivery of the Incident Aircraft from Defendant Boeing and placed it into commercial service on or about November 11, 2023. The aircraft completed approximately 154 revenue flights prior to the Incident Flight. During those operations, the unsecured MED plug gradually migrated upward, leaving visible scoring and witness marks later documented by the NTSB.

28. Between December 7, 2023, and January 4, 2024, the Incident Aircraft's

cabin-pressurization system repeatedly generated "AUTO FAIL" warnings during flight operations. On each occasion, Alaska Airlines personnel manually reset the system and returned the Incident Aircraft to service without identifying or correcting the underlying cause. On January 4, 2024, a mechanic for Defendant Alaska documented and reported the recurring pressurization faults and recommended grounding the Incident Aircraft pending further inspection. Defendant Alaska nevertheless elected to continue limited passenger operations rather than comply with that recommendation.

29.  On January 5, 2024, Plaintiffs boarded the Incident Aircraft operated by Defendant Alaska. Plaintiff Mother occupied seat 25B, and Plaintiff Son occupied seat 25A, adjacent to the interior panel concealing the MED plug. While the aircraft was climbing after takeoff from Portland International Airport, the MED plug assembly on the left side of the Incident Aircraft unexpectedly separated from the fuselage, causing an immediate and explosive decompression of the cabin of the Incident Aircraft. Because Plaintiffs were seated directly beside the location where the MED plug detached, they were exposed to the full force of the sudden decompression. During the event, Son's shirts were torn from his body and sucked out of the Incident Aircraft, and his seat was visibly displaced toward the opening. Amid the sudden depressurization and violent airflow, Mother grasped and held onto Son out of fear that he would be pulled out of the Incident Aircraft.

30.  The rapid loss of cabin pressure caused a violent displacement of interior paneling in the area of the dislodged plug, exposed insulation and structural components, and triggered the deployment of oxygen masks. The abrupt depressurization produced intense noise and powerful airflow that disrupted the cabin area and created an immediate and dangerous physical hazard to Plaintiffs. Plaintiffs suffered physical injury and bodily impact resulting from the sudden depressurization, and acute emotional and psychological distress consistent with a sudden, life-threatening, in-flight emergency.

31. Following the decompression, Defendant Alaska's cabin crew failed to render prompt assistance to Plaintiffs. Other passengers assisted Son in moving to a safer seat away from the hole in the Incident Aircraft, and Mother then moved to another open seat. According to statements later provided to NTSB investigators, a flight attendant stated that she "was screaming at them to get in [their] seats," rather than rendering aid to the Plaintiffs during the emergency. Following the depressurization, the aircraft returned to Portland International Airport, where Oregon-based emergency responders and medical personnel conducted the initial post-incident assessment and care. Plaintiffs' injuries were evaluated and treated in Oregon.

## V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF – PRODUCT LIABILITY

(*Against Defendants The Boeing Company, Spirit AeroSystems, Inc., and Quik Tek Machining, LLC*)

32. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

33. At all times material, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, and selling commercial aircraft, including the 737 MAX series and the Incident Aircraft. Defendants Spirit and Quik Tek were engaged in the business of designing, manufacturing, and supplying component parts and assemblies incorporated into Boeing 737 MAX aircraft. Defendant Spirit also performed major structural assembly work for the 737 MAX program, including the manufacture and assembly of the fuselage section installed on the Incident Aircraft.

34. The Incident Aircraft was placed into the stream of commerce in a defective condition unreasonably dangerous to foreseeable users and passengers, including Plaintiffs. The Incident Aircraft contained defects in its design, manufacture, assembly, inspection, and quality control processes, as described above. These defects rendered the Incident Aircraft unsafe for its intended and reasonably foreseeable use, and caused the MED plug assembly to fail during the Incident Flight. At the time the Incident Aircraft and its component parts left the possession and control of Defendants Boeing, Spirit, and Quik Tek, they failed to conform to

applicable design specifications, manufacturing tolerances, quality standards, and the representations made by Defendants, and were in an unreasonably dangerous condition that proximately caused Plaintiffs' injuries.

35. Pursuant to ORS 30.900 *et seq*. ("Oregon Product Liability Act"), Defendants Boeing, Spirit, and Quik Tek owed statutory duties to foreseeable users, consumers, and bystanders—including commercial air passengers such as Plaintiffs— to design, manufacture, assemble, inspect, and test aircraft and aircraft component parts to ensure that they were reasonably safe for their intended and foreseeable uses. Plaintiffs are members of the class of persons the Oregon Product Liability Act was enacted to protect, and the physical and psychological injuries they sustained are of the type of harm that the Act was intended to prevent.

36. The Incident Aircraft reached Defendant Alaska—and ultimately Plaintiffs—without substantial change in the condition in which it was designed, manufactured, assembled, and placed into the stream of commerce by Defendants Boeing, Spirit, and Quik Tek. At all relevant times, the Incident Aircraft and its component parts posed dangers beyond those that an ordinary commercial air passenger would reasonably contemplate when using the aircraft in its intended and foreseeable manner.

37. The defective condition of the Incident Aircraft— including defects in its design, manufacture, assembly, and inspection—were the direct and proximate

cause of the in-flight separation of the MED plug during the Incident Flight. That separation caused an explosive decompression of the Incident Aircraft cabin and resulted in Plaintiffs' physical injuries and severe emotional and psychological trauma.

38. Defendants Boeing, Spirit, and Quik Tek are strictly liable in tort under ORS 30.900*et seq*., because the Incident Aircraft, including its component parts, was in a defective and unreasonably dangerous condition at the time it left their possession and control, and that defective condition was the direct and proximate cause of the in-flight separation of the MED plug and the resulting explosive decompression during the Incident Flight.

39. As a direct and proximate result of the defective and unreasonably dangerous condition of the Incident Aircraft and its component parts, Plaintiffs have incurred —and will continue to incur—economic damages, including medical expenses, treatment costs, and other related out-of-pocket losses in amounts to be proven at trial.

40.  As a further direct and proximate result of the conduct of Defendants Boeing, Spirit, and Quik Tek, as described above, Plaintiffs have suffered —and will continue to suffer—substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

41.  The total of Plaintiffs' economic and non-economic damages exceeds

$75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

42. The acts or omissions of Defendants Boeing, Spirit, and Quik Tek, as alleged above, demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious indifference to the health, safety, and welfare of commercial air passengers, including Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Defendants Boeing, Spirit, and Quik Tek in an amount sufficient to punish and deter such conduct, and which, when combined with compensatory damages, further confirm that the amount in controversy exceeds the jurisdictional minimum under 28 U.S.C. § 1332(a).

**SECOND CLAIM FOR RELIEF**

**COUNT I – NEGLIGENCE**

(*Against Defendants The Boeing Company, Spirit AeroSystems, Inc., and Quik Tek Machining, LLC*)

43. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

44. At all times material, Defendants Boeing, Spirit, and Quik Tek each owed Plaintiffs—as foreseeable users and passengers of the Incident Aircraft—a duty to exercise reasonable care in performing their respective roles in the design, manufacture, assembly, installation, inspection, and supply of aircraft and

FIRST AMENDED CIVIL COMPLAINT -24

component parts. Each Defendant further owed a duty to exercise reasonable care to avoid creating or failing to correct foreseeable risks of harm and to ensure that the Incident Aircraft and its component parts were airworthy, free from dangerous defects, and compliant with applicable federal aviation standards, including those promulgated under 14 C.F.R. Part 21 *et seq*. and the Federal Aviation Act of 1958 (49 U.S.C. § 40101 *et seq*.).

45.  Defendants Boeing, Spirit, and Quik Tek breached their duty of reasonable care by engaging in acts and omissions that created a foreseeable and unreasonable risk of harm to Plaintiffs and other commercial air passengers. Their acts and omissions, individually and collectively, contributed to the unairworthy and unsafe condition of the Incident Aircraft. These breaches include, but are not limited to the following:

    a.  Defendant Boeing's Negligence:

        i.  Failing to properly assemble, install, and secure the MED plug and associated components during production of the Incident Aircraft;

        ii.   Failing to conduct adequate inspections, testing, and quality-assurance procedures to verify the airworthiness and proper installation of the MED plug assembly;

        iii. Failing to detect, correct, or prevent defective conditions created during assembly, including the absence of required retaining

bolts;

    iv.  Failing to properly document, verify, and inspect the removal and reinstallation of the MED plug during the assembly process;

    v.  Authorizing or approving the release of the Incident Aircraft for commercial service despite known or reasonably discoverable defects that rendered it unairworthy;

    vi.  Failing to provide adequate training, guidance, and oversight necessary to ensure that manufacturing personnel could consistently and correctly comply with Defendant Boeing's parts removal process.

  b.  Defendant Spirit's Negligence:

    i.  Failing to design, manufacture, and assemble fuselage sections and MED-plug-related structures in accordance with applicable engineering specifications, tolerances, and safety standards;

    ii.  Failing to implement adequate inspection and quality-control measures to ensure that fuselage structures and MED plug-related components delivered to Defendant Boeing were free from defects;

    iii.  Delivering fuselage structures and MED plug-related components in a defective or non-conforming condition that contributed to the

unsafe installation, misalignment, or failure of the MED plug.

c.  Defendant Quik Tek's Negligence:

    i.  Failing to properly manufacture fuselage-frame components, including fasteners, rivets, and structural elements installed in the body-join area adjacent to the MED plug assembly;

    ii.  Providing defective or improperly installed fasteners that caused misalignment or structural irregularities requiring removal of the MED plug during the assembly process;

    iii. Failing to implement adequate inspection, testing, and quality-assurance procedures to ensure that delivered components conformed to required specifications and tolerances.

d.  Shared Breaches (Defendants Boeing, Spirit, and Quik Tek):

    i.  Failing to ensure that the aircraft and its component parts were airworthy and reasonably safe for their intended and foreseeable use;

    ii.  Failing to exercise reasonable care under the circumstances to prevent foreseeable risks of harm to commercial air passengers, including Plaintiffs.

46. As a direct and proximate result of the negligent acts and omissions of Defendants Boeing, Spirit, and Quik Tek's acts and omissions alleged above, the

MED plug separated from the fuselage of the Incident Aircraft during the Incident Flight, causing an explosive decompression that resulted in foreseeable physical injuries and severe emotional and psychological trauma to Plaintiffs.

47.  The negligence of Defendants Boeing, Spirit, and Quik Tek was a substantial factor in causing Plaintiffs' economic damages, including past and future medical expenses and related out-of-pocket losses, in amounts to be proven at trial.

48.  As a further direct and proximate result of the negligence of Defendants Boeing, Spirit, and Quik Tek, Plaintiffs have suffered—and continue to suffer— substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

49.  The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

50.  The acts or omissions of Defendants Boeing, Spirit, and Quik Tek as alleged above demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious indifference to the health, safety, and welfare of commercial air passengers, including Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Defendants Boeing, Spirit, and Quik Tek in an amount sufficient to punish and deter such conduct, and which, when combined with compensatory damages, further confirm that the amount in controversy

exceeds the jurisdictional minimum under 28 U.S.C. § 1332(a).

## COUNT II – NEGLIGENCE PER SE

(*Against Defendant The Boeing Company*)

51**.**  Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

52.  Under Oregon law, violation of a statute or administrative regulation adopted to protect a specific class of persons against a specific type of harm constitutes negligence *per se*.

53.  At all times material, Defendant Boeing held an FAA Type Certificate for the design of the Boeing 737 MAX series. As the Type-Certificate holder and production-approval holder, Defendant Boeing was required to insure that each aircraft— including the Incident Aircraft—was manufactured, assembled, inspected, and delivered in full compliance with the approved type design and all applicable Federal Aviation Regulations ("FARs") governing design, inspection, airworthiness, and production.

54.  Defendant Boeing was subject to, and required to comply with numerous FARs imposing mandatory safety and airworthiness duties, including, but not limited to:

> a.  14 C.F.R. § 21.3 - requiring immediate reporting to the FAA of any
>
>     defect  or  failure that Defendant Boeing determines could result in a

significant structural defect or failure in an aircraft that has left Defendant

Boeing's quality-control system;

b. 14 C.F.R. § 21.20 - requiring demonstration of compliance with all

applicable airworthiness requirements as a prerequisite for issuing and

maintaining a Type Certificate;

c. 14 C.F.R. § 21.33(b) - requiring Defendant Boeing to perform all

inspections and tests necessary to ensure that:

    i.  each product complies with airworthiness and design

      requirements;

    ii.  materials and components conform to the approved type design;

      and;

    iii. manufacturing processes, construction, and assembly conform

      to those approved by the FAA;

d. 14 C.F.R. § 25.605 - requiring that fabrication and assembly methods

produce a consistently sound structure; and

e. 14 C.F.R. § 43.3 - restricting structural alterations, including removal or

reinstallation of fuselage panels, to certificated mechanics or persons

working under their supervision.

55. Each of the foregoing regulations was in effect when the Incident Aircraft and

its component parts were designed, manufactured, assembled, integrated, and

certified by Defendant Boeing. These regulations were enacted to protect a specific class of persons —commercial aircraft passengers— from a specific type of harm: structural failure, loss of airframe integrity, sudden depressurization, and resulting physical injury.

56.  Defendant Boeing's violations of the applicable FARs constitute negligence *per se* under Oregon law because (1) Plaintiffs are members of the class the regulations were enacted to protect, and (2) the injuries they suffered—including physical injury and psychological harm associated with structural failure, sudden depressurization, and loss of cabin integrity—are the precise type of harm the regulations were intended to prevent.

57.  Defendant Boeing's violations of the applicable FARs were a substantial factor in, and proximate cause of the in-flight separation of the MED plug. Defendant Boeing was responsible for the aircraft's design, assembly, installation, inspection, and quality-assurance processes, including procedures governing the installation and retention of the MED plug on the Incident Aircraft. Deficiencies, nonconformities, or failures in Boeing's airworthiness, conformity, and production-quality systems allowed the aircraft to leave Boeing's control in a structurally unsafe condition, which resulted in the MED plug's in-flight separation, the explosive decompression and the Plaintiffs' physical injuries and severe emotional and psychological trauma.

58. As a direct and proximate result of Defendant Boeing's negligence *per se*, Plaintiffs have incurred—and will continue to incur—economic damages, including medical expenses, treatment costs, and related out-of-pocket losses, in amounts to be proven at trial.

59. As a further direct result of Defendant Boeing's negligence *per se*, Plaintiffs have suffered—and continue to suffer—substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

60. The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

61. Defendant Boeing's violations of the FARs identified above demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious disregard to the health, safety, and welfare of commercial air passengers, including Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Defendant Boeing in an amount sufficient to punish and deter such conduct, and which, when combined with compensatory damages, further confirm that the amount in controversy exceeds the jurisdictional minimum under 28 U.S.C. § 1332(a).

## COUNT III – NEGLIGENCE PER SE

(*Against Defendant Spirit AeroSystems, Inc*)

62. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

63. At all times material, Defendant Spirit held an FAA Production Certificate for the manufacture of aircraft fuselages and related structural assemblies for Boeing 737 MAX aircraft. As a production-certificate holder, Defendant Spirit was required to design, manufacture, assemble, inspect, and deliver fuselage structures and MED-plug-related components in full conformity with the approved Boeing 737 MAX type design and all applicable FARs.

64. Defendant Spirit was required to comply with numerous FARs imposing mandatory safety, conformity, and airworthiness obligations, including, but not limited to:

a. 14 C.F.R. § 21.137 - requiring Defendant Spirit to establish and maintain a quality-assurance system ensuring that each product and article conforms to its approved design and is in a condition for safe operation, including adequate inspection, testing, and control of manufacturing processes;

b. 14 C.F.R. § 21.146 - requiring that each product or article manufactured under Defendant Spirit's Production Certificate conform to its approved design and be in a condition for safe operation at the time of delivery;

c. 14 C.F.R. § 21.150 - requiring immediate written notification to the FAA of any change affecting the inspection, conformity, design compliance, or the airworthiness of articles produced under Defendant Spirit's Production Certificate;

d. 14 C.F.R. § 25.603(b) - requiring that materials used in structural components affecting safety meet approved specifications for suitability and durability; and

e. 14 C.F.R. § 25.605 - requiring fabrication methods that produce a consistently sound and safe structure.

65. Each of the foregoing regulations was in effect when Defendant Spirit designed, manufactured, assembled, and delivered the fuselage section and MED-plug-related structural components incorporated into the Incident Aircraft. These regulations were enacted to protect a class of persons—commercial air passengers—from a specific type of harm: structural failure, loss of airframe integrity, sudden depressurization, and resulting physical injury.

66. Defendant Spirit's violations of the applicable FARs constitute negligence *per se* under Oregon law because (1) Plaintiffs are members of the class the regulations were enacted to protect, and (2) the injuries they suffered—including physical injury and psychological harm associated with structural failure, sudden depressurization, and loss of cabin integrity—are the precise type of harm the

regulations were intended to prevent

67.  Defendant Spirit's violations of the applicable FARs were a substantial factor in, and proximate cause of structural nonconformities affecting the fuselage sections and MED plug-related components it manufactured and supplied. These nonconformities contributed to improper conditions affecting the MED plug's installation and retention during aircraft assembly, which led to the in-flight separation of the MED plug, the resulting explosive depressurization, and Plaintiffs' physical and psychological injuries.

68.  As a direct and proximate result of Defendant Spirit's negligence *per se*, Plaintiffs have incurred, and will continue to incur, economic damages, including medical expenses, treatment costs, and related out-of-pocket losses, in amounts to be proven at trial.

69.  As a further direct and proximate result of Defendant Spirit's negligence *per se*, Plaintiffs have suffered—and continue to suffer—substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

70.  The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

71.  Defendant Spirit's violations of the FARs identified above demonstrate a

reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious indifference to the health, safety, and welfare of commercial air passengers, including Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Defendant Spirit in an amount sufficient to punish and deter such conduct, and which, when combined with compensatory damages, further confirm that the amount in controversy exceeds the jurisdictional minimum under 28 U.S.C. § 1332(a).

**COUNT IV – NEGLIGENCE PER SE**

(*Against Defendant Quik Tek Machining, LLC*)

72.   Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

73.   Upon information and belief, at all times material, Defendant Quik Tek operated under an FAA Parts Manufacturer Approval ("PMA") issued by the FAA. As a PMA holder, Defendant Quik Tek was required to design, manufacture, and supply aircraft parts in full conformance with the approved Boeing 737 MAX type design and all applicable FARs governing design conformity, quality assurance and airworthiness.

74.  As a PMA holder, Defendant Quik Tek was required to comply with various FARs, imposing mandatory safety, conformity, and airworthiness obligations, including, but not limited to:

    a. 14 C.F.R. § 21.303(b) - requiring Defendant Quik Tek to perform all

       inspections and tests necessary to determine that:

       i. each article complies with applicable airworthiness requirements;

       ii. materials conform to approved design specifications;

       iii. each article conforms to its approved design; and

       iv. manufacturing processes, construction, and assembly conform to

       the approved design;

    b. 14 C.F.R. § 21.307 - requiring Defendant Quik Tek to comply with

       the quality-management system requirements of § 21.137 to ensure

       that each product or article conforms to its approved design and is in

       a condition for safe operation;

    c. 14 C.F.R. § 21.316(c) - requiring Quik Tek to ensure that each

       article produced under its PMA conforms to its approved design and

       is in a condition for safe operation; and

    d. 14 C.F.R. § 25.603(b) - requiring that materials used in structural

       parts affecting safety meet approved specifications for suitability and

       durability.

75. Each of the foregoing regulations was in effect when Defendant Quik Tek

designed, manufactured, and supplied the fuselage-frame components incorporated

into the Incident Aircraft. These regulations were enacted to protect a class of

persons—including commercial air passengers—from a specific type of harm: structural failure, loss of airframe integrity, sudden depressurization, and resulting physical injury.

76. Defendant Quik Tek's violations of the applicable FARs constitute negligence *per se* under Oregon law because (1) Plaintiffs are members of the class the regulations were enacted to protect, and (2) the injuries they suffered—including physical injury and psychological harm associated with structural failure, sudden depressurization, and loss of cabin integrity—are the precise type of harm the regulations were intended to prevent.

77. Defendant Quik Tek's violations of the applicable FARs were a substantial factor in, and proximate cause of, structural nonconformities in the fuselage-frame components it designed, manufactured, and supplied for incorporation into the Incident Aircraft. These nonconformities contributed to improper conditions affecting the MED plug's installation and retention during aircraft assembly, which led to the in-flight separation of the MED plug, the resulting explosive depressurization, and Plaintiffs' resulting physical and psychological injuries.

78. As a direct and proximate result of Defendant Quik Tek's negligence *per se*, Plaintiffs have incurred—and will continue to incur—economic damages, including medical expenses, treatment costs, and related out-of-pocket losses in amounts to be proven at trial.

79. As a further direct and proximate result of Defendant Quik Tek's negligence *per se*, Plaintiffs have suffered—and continue to suffer— substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

80. The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

81. Defendant Quik Tek's violations of the FARs identified above demonstrate a reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious indifference to the health, safety, and welfare of commercial air passengers, including Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Defendant Quik Tek in an amount sufficient to punish and deter such conduct, and which, when combined with compensatory damages, further confirm that the amount in controversy exceeds the jurisdictional minimum under 28 U.S.C. § 1332(a).

**THIRD CLAIM FOR RELIEF**

**BREACH OF THE DUTY OF A COMMON CARRIER**

(*Against Defendant Alaska Airlines Inc.*)

82. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

83.  This claim is brought under Oregon law for negligence arising from Defendant Alaska's breach of its duty, as a common carrier, to exercise the highest degree of care for the safety of its passengers.

84.  At all times material, Defendant Alaska held an Air Carrier Operating Certificate issued under 49 U.S.C. § 44705 and operated as a commercial air carrier transporting fare-paying passengers, including Plaintiffs. As a common carrier, Defendant Alaska owed its passengers the highest degree of care consistent with the practical operation of its business, and was required to exercise utmost vigilance, foresight, and precaution to ensure their safe transportation. This heightened duty of care extended to the hiring, training, supervision, and conduct of its flight crews, maintenance personnel, and other agents responsible for passenger safety.

85.  Defendant Alaska breached its duty of care as a common carrier in one or more of the following particulars, each of which created a foreseeable and unreasonable risk of harm to Plaintiffs:

> a.  In purchasing, operating, and placing the Incident Aircraft into service despite actual or constructive knowledge of systemic safety deficiencies in the Boeing 737 MAX design,  including safety concerns involving fuselage assembly and the MED-plug system;
>
> b.  In failing to remove the Incident Aircraft from service following

repeated "AUTO FAIL" pressurization warnings in the days

immediately preceding the Incident Flight;

c.  In failing to maintain the Incident Aircraft in an airworthy

condition and failing to identify or respond to indications of

pressurization or structural anomalies;

d.  In failing to detect, investigate, or respond to visible signs of MED

plug movement or other structural irregularities prior to the

Incident Flight;

e.  In failing to adequately train, equip, or supervise cabin crew and

maintenance personnel to recognize, report, or respond to

pressurization warnings, structural failures, or catastrophic

decompression hazards;

f.  In failing to provide timely and adequate assistance, care and

protective measures to Plaintiffs during and following the MED plug

separation and explosive decompression.

86.  Defendant Alaska's acts or omissions, as set forth above, were a substantial

factor in causing Plaintiffs' physical injuries and severe psychological trauma

during and after the Incident Flight.

87.  As a direct and proximate result of Defendant Alaska's breaches of its

duties as a common carrier, Plaintiffs have incurred—and will continue to incur—

economic damages, including medical expenses, treatment costs, and related out-of-pocket losses in amounts to be proven at trial.

88.  As a further direct and proximate result of Defendant Alaska's conduct, Plaintiffs have suffered—and will continue to suffer—substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

89.  The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

(*Against Defendants The Boeing Company and Spirit AeroSystems, Inc.*)

90.  Plaintiffs re-allege and incorporate by reference each of the allegations set forth above as though fully restated herein.

91.  At all times material, Defendants Boeing and Spirit were engaged in the business of designing, manufacturing, assembling, and selling goods within the meaning ORS 72.3140. Specifically:

    a.  Defendant Spirit designs, manufactures, and sells major commercial-aircraft fuselage assemblies and related structural components, including the fuselage section and MED plug-related structures incorporated into

the Incident Aircraft.

b.  Defendant Boeing designs, manufactures, assembles, and sells

commercial aircraft, including the Boeing 737-9 MAX identified herein

as the Incident Aircraft.

92.  As merchants, Defendants Spirit and Boeing impliedly warranted that the

goods they placed into the stream of commerce were merchantable.

93.  Under ORS 72.3140(1), the implied warranty of merchantability guarantees,

among other things, that goods sold by a merchant:

(a) pass without objection in the trade;

(b) are of fair, average quality within the description;

(c) are fit for the ordinary purposes for which such goods are used;

(d) are adequately contained, packaged, and labeled; and

(e) conform to any promises or affirmations of fact made on the container or

label.

94. As the manufacturer and seller of the fuselage sections and structural

components incorporated into the Incident Aircraft, Defendant Spirit impliedly

warranted that the fuselage assemblies and structural components it sold to

Defendant Boeing were of merchantable quality, conformed to the applicable type

design, and were fit for their ordinary and intended purpose, namely, incorporation

into an airworthy commercial aircraft.

FIRST AMENDED CIVIL COMPLAINT -43

95. As the manufacturer and seller of Incident Aircraft, Defendant Boeing

impliedly warranted that the Incident Aircraft was airworthy, free from defects in

design, manufacture, and assembly, and fit for its ordinary and intended purpose,

namely, the safe commercial carriage of airline passengers, including Plaintiffs.

96. Defendants Spirit and Boeing breached the implied warranty of merchantability

because the goods each sold into the stream of commerce were defective,

unairworthy, and unsafe for their ordinary and intended purpose when they left

their respective possession and control. The Incident Aircraft and its fuselage

structures contained, among other defects, an improperly installed and unsecured

MED plug and related structural nonconformities that rendered the Incident

Aircraft unfit for commercial passenger operation and not of merchantable quality.

Upon information and belief, these defects remained substantially unchanged

through the date of the Incident Flight.

97. Plaintiffs were intended, foreseeable, and protected users of the Incident

Aircraft and of the fuselage and structural components incorporated into it. Oregon

law extends implied warranties beyond the immediate purchaser to any natural

person whom the manufacturer may reasonably expect to use, ride in, or be harmed

by the goods, including passengers aboard a commercial aircraft. Plaintiffs, as fare-

paying passengers, were beneficiaries of the implied warranties made by both

Defendants Spirit and Boeing.

98. The breaches of implied warranty by Defendants Spirit and Boeing were substantial factors in, and proximate causes of, the in-flight separation of the MED plug, the resulting explosive depressurization, and the physical injuries and severe emotional and psychological trauma suffered by Plaintiffs.

99. As a direct and proximate result of Defendants Boeing and Spirit's breaches of implied warranty of merchantability, Plaintiffs have incurred—and will continue to incur—economic damages, including medical expenses, treatment costs, and other related out-of-pocket costs, in amounts to be proven at trial.

100.  As a further direct result of Defendants Boeing and Spirit's breaches set forth above,  Plaintiffs have suffered—and will continue to suffer—substantial non-economic damages, including pain, suffering, emotional distress, and loss of enjoyment of life.

101.  The total of Plaintiffs' economic and non-economic damages exceeds $75,000, exclusive of interest and costs, and will be established by competent evidence at trial.

102.  As intended beneficiaries of the implied warranties of merchantability made by both Boeing and Spirit, Plaintiffs are entitled to recover all damages proximately caused by the breaches of those warranties, and no disclaimer, limitation of warranty, or limitation of liability is enforceable against them under ORS 72.3160, ORS 72.7190, or any other provision of Oregon law.

## VI. DEMAND FOR A JURY

103.  Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against all Defendants, jointly and severally where permitted by law, and request that the Court award the following relief:

1. Economic damages in an amount to be proven at trial, including but not limited to past and future medical expenses, psychological treatment costs, and related out-of-pocket losses;

2. Non-economic damages in an amount to be proven at trial, including compensation for pain, suffering, emotional distress, and loss of enjoyment of life;

3. Punitive damages against Defendants Boeing Company, Spirit, and Quik Tek in an amount sufficient to punish and deter similar misconduct, pursuant to ORS 31.730 and applicable law;

4. Attorney fees and costs incurred in this action, as allowed by law; and

5. Such other and further relief as the Court deems just and proper.

### AMOUNT-IN-CONTROVERSY STATEMENT

The total amount of damages sought by Plaintiffs—including economic,

non-economic, and punitive damages—exceeds $75,000, exclusive of interest and costs, thereby satisfying the jurisdictional requirement of 28 U.S.C. § 1332(a).

DATED: December 12, 2025.

THE STEELE LAW FIRM

*/s/ Nathan G. Steele*
Nathan G. Steele, OSB No. 004386
Attorney for Plaintiffs
The Steele Law Firm
125 NW Greeley Avenue
Bend, Oregon 97703
Telephone: (541) 647-1812
Email: ngs@steelefirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2025, I electronically filed the foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will automatically serve registered users Brett T. MacIntyre, Caryn Geraghty Jorgensen, John Fetters, Vanessa G. Aaron, and Evelyn E. Winters.

I further certify that I served the foregoing document by email, pursuant to Fed. R. Civ. P. 5(b)(2)(E), on the following counsel who have not yet appeared in this action:

Christopher Ledford - CLedford@perkinscoie.com
Alletta Brenner - abrenner@perkinscoie.com
Mark Schultz - mschultz@perkinscoie.com
Diane Wilson – dwilson@foxrothschild.com
Jeanne F. Loftis - jeanne.loftis@bakersterchi.com; pnwservice@bakersterchi.com
Victoria K. Baker – victoria.baker@bakersterchi.com
William J. Katt - william.katt@wilsonelser.com

THE STEELE LAW FIRM, P.C.


*/s/ Nathan G. Steele*
Nathan G. Steele, OSB No. 004386
Attorney for Plaintiffs
The Steele Law Firm
125 NW Greeley Avenue
Bend, Oregon 97703
Telephone: (541) 647-1812
Email: ngs@steelefirm.com